### VENICE v. FRAZIER DAVIS CONST. CO. et al.

### Civ. A. No. 3048.

United States District Court
D. Canal Zone, Balboa Division.
Dec. 23, 1949.

Donald J. McNevin, Ancon, Canal Zone, for defendants.

Woodrow De Castro, Ancon, Canal Zone, of Van Siclen, Ramirez, and De Castro, of Ancon, Canal Zone, for the plaintiff.

HANCOCK, District Judge.

This action was instituted by plaintiff Venice against Frazier Davis Construction Company and MacDonald Construction Company to enforce payment under a written contract wherein the use of steel beams was rented, and as claimed, that contrary to such contract some of the steel was not returned and other steel was returned in a damaged and unusable condition.

The defendant Frazier Davis Construction Company is not before the Court by process or appearance, and the proceedings have been prosecuted alone against the MacDonald Construction Company. Prior to November 10, 1947, the MacDonald Construction Company, hereafter referred to as defendant, was engaged in erecting a culvert in the bed of Rio Curundu River. This culvert was 20 feet wide and 11 feet deep. The territory through which this excavation was being dug for the culvert was composed of a type of soil known as "sea mud", necessitating the erection and use of a cofferdam constructed of metallic piling along the sides to prevent the banks of sludge from sliding or caving in.

During the process of the work and prior to November 10th, 1947, defendant discovered that the pressure of the sludge was too great for the metallic piling. Bracing of this metallic piling was then resorted to by placing steel beams as supports to each side of cut and against metallic piling. This was not sufficient to withstand the pressure of the sludge, for the pressure was too great for the strength of the steel beams then being used. To correctly describe the impending conditions, we refer to the language of defendant's superintendant who was in charge of the undertaking. On Page 77, Transcript of Testimony, the superintendant stated: "I had shipped down $8000.00 of beams from the United States, brand new beams, in the hope that they would be sufficient. There is no actual way of calculating the pressure in the sea mud. We weighed it, we found it to weight 90 pounds to the cubic foot, but that meant nothing because it was unstable * * *. We installed some of the beams that we brought down, and subsequent to that date (October 25, 1947) they failed. They were absolutely crushed by the pressure."

Defendant being confronted with these difficulties sought other means of obtaining bracing sufficient to resist this pressure. Plaintiff at that time owned and had stored at Paraiso, four structures referred to as trusses, and one bridge.

There is some controversy relative to negotiations between the Superintendant of defendant and plaintiff prior to execution of contract, of which issue there will be no reference. To refer to such would serve no purpose or assistance in determining the issues in this controversy.

Plaintiff and defendant's Superintendent went to "Paraiso" where these four trusses and bridge were located. These four structures were composed of steel beams fastened together with bolts and rivets, and one bridge, 105 feet long and 20 feet wide, likewise was composed of steel beams and bolted and riveted together. Defendant's Superintendant made measurements to get the dimensions of the steel constituting these structures. He ascertained that some of the steel beams were 8 inch at 33 pounds, and others 8 x 13 "H" beams. The Superintendant then advised plaintiff that defendant would not be interested in the use of the steel beams, as defendant desired beams that would be economical in weight and easily handled; that the beams contained in the structures or struts of plaintiff were big and awkward, and that defendant did not want them.

Soon thereafter a Mr. Wyatt, defendant's Manager, came to the Canal Zone, and while he was here a second failure of the cofferdam bracing took place. Up to that time all bracing theretofore used had been the steel which defendant had purchased in the United States, to be used for bracing.

The Manager, Wyatt, upon the second failure, directed defendant's Superintendant to contact plaintiff and rent the use of the steel contained in the four trusses and bridge belonging to plaintiff, the Manager and Superintendant realizing that the

steel contained in the trusses and bridge of plaintiff could be obtained faster than they could be obtained in the States. The Superintendant contacted plaintiff, Venice, and the Superintendant and Mr. Wyatt prepared contract which was signed "MacDonald Construction Company, by E. H. Kersting, individually and as General Superintendant", and by the plaintiff Venice, on November 10th, 1947. The contract contained seven separate paragraphs, as follows:

"1. You certify that the five (5) steel spans are your property, without lien or claim against them.

"2. Steel is to be rented to us for use principally as cofferdam bracing during the entire construction period of the Rio Curundu River Culvert.

"3. We are to move the five (5) steel spans from their present position to a location accessible by road, at our expense.

"4. We are to disassemble the trusses and haul to our yard at our expense. We are to stand all expenses of disassembling trusses.

"5. We are to pay you as rental on such steel as we take from the trusses the sum of two thousand five hundred dollars ($2500.00), same to be complete and full payment for rental for the period necessary to complete our contract for the Rio Curundu Culvert.

"6. At the completion of the rental period, we are to turn over to you at your yard in Panama City all steel in good condition, less ordinary wear and tear inherent to such type of work.

"7. All steel we are unable to return we are to pay you at the price of $59.00 per ton."

After the above contract was executed, defendant moved the trusses and bridge across the Canal from Paraiso, to the West Bank of Cocoli, and the disassembling was begun.

The weight of the steel contained in these trusses and bridge was not known, and no weight was mentioned or estimated or obtained. The contract between plaintiff and defendant was prepared by the representatives of the defendant, in which a rental price for the use of such steel was provided, and in addition to the rental price was a proviso that for any steel not returned, a price of $59.00 per ton was to be paid to plaintiff by defendant. It was the understanding between the contracting parties that the trusses and bridge were to be disassembled, and the steel obtained through such disassembling was to be used as bracing for the cofferdam.

Defendant's Superintendant was in a better position to know, and at the time this contract was prepared, did know, the strain to which the steel contracted for would be subjected. He had experienced the failure of the steel obtained from the States to withstanding the existant pressure to which the bracing would be subjected. He knew the dimensions of the steel contained in the trusses and bridge of plaintiff, and it is reasonable to believe that defendant's representative did know that some of the steel obtained from plaintiff would be lost, or its usable condition destroyed. In view of that expected loss, the provision for payment of unreturned steel was made. Defendant's Superintendant admits that some of this steel was lost and the usable condition of other steel was destroyed. On page 88 of Transcript of Record the Superintendant stated: "I delivered every bit that I had received, minus a few pieces that I was ashamed to send back. During the use of this material there were pieces I used as high as 60 times, and they were so badly battered up that I was ashamed to send them back. Our bottom strut had to be jacked out with two thirty-ton jacks, and then they wouldn't move, and we were forced to take a torch and cut through the eight inch beams to remove them, and upon removal we would take the splice plates and weld them back together so we could reuse them. Some of them were in such bad shape as to be beyond normal wear and tear. Some of the plates were missing. We had a record of those, and one small part of one of his large beams had been cut off and it was less than a foot long. I didn't feel that we could return some-

thing less than a foot long in the larger beams, so I charged that to myself."

On page 93, Transcript of Testimony, this Superintendent stated that "12 tons of this steel was purely and simply scrap."

According to complaint, defendant between the dates of December 22nd and December 30th, 1948, returned to plaintiff 371.28 tons of that steel which defendant regarded as returnable. However, plaintiff refused to accept the steel returned, but did accept 221.788 tons as returnable under the contract.

Plaintiff's claim asserted herein is to recover for a claimed shortage between the steel delivered to defendant and the steel returned to plaintiff. The rental for the use of the steel was met and there is no issue presented in reference to such rental. The claimed difference in tonnage between the steel tendered and the tonnage accepted is 149.492 tons.

*Law and Facts.*

■ The law governing the claim of plaintiff and the liability of defendant is prescribed by the law of bailment. The contract involved in this litigation was a bailment for hire for the mutual advantage of the parties, i. e., a hiring of personal property for a stated period of time and for a sum of money for its use. The degree of care to be exercised by a bailee in a bailment for mutual benefit is placed by the law at ordinary care. 6 American Jur., Page 333, Sec. 248.

■ However, a bailee may enlarge his legal responsibility by contract, even to the extent of making himself absolutely liable as an insurer for the loss or destruction of goods submitted to his care, and the contract embracing such liability is controlling, and must be enforced according to its terms, irrespective of the fact that a less onerous liability is imposed by law on bailees of the same class generally. For such an undertaking, the bailment itself or the compensation to be paid for it is a sufficient consideration. 6 American Jur. Page 277, Sec. 181.

■ However, the language of such special provisions must be clear and unmistakable in order to vary the ordinary rights, duties and obligations of parties to a contract of bailment. It is generally held that by a mere promise on the part of the bailee to return the property, the parties do not intend that he should incur a greater obligation than the law would otherwise imply. 6 American Jur. Page 277, Sec. 182; Reconstruction Finance Corp. v. Peterson Bros., 5 Cir., 160 F.Rep.2d 124.

■ Using the above principal of law as a yard stick to measure the contractual obligations of defendant, we are confronted with two paragraphs contained in the contract between plaintiff and defendant. Paragraph 6 provides: "At the completion of the rental period we are to turn over to you at your yard in Panama City all steel in good condition, less ordinary wear and tear inherent to such type of work." If paragraph 6 was the only provision expressing the duties or obligations of defendant relative to the returning of the steel in question, there would be no liability on defendant under the contract in absence of proof being offered that the damaged condition or loss was brought about through the negligent use or the failure of defendant to exercise ordinary care. Reconstruction Finance Corp. v. Peterson Bros., 5 Cir., 160 F.2d 124.

However, when paragraph 7 of the contract is considered, there is expressed in clear and unmistakable terms the intent and specific agreement that defendant bailee enlarged its legal responsibility for the return of the property bailed. Under paragraph 7, the defendant agrees to *pay* for any steel not returned, and stipulates the price per ton for any steel not returned.

■ The Court therefore finds that under paragraph 7 of the contract, defendant enlarged its liability as an insurer to pay to plaintiff at the rate of $59.00 per ton for any steel which defendant was unable to return. Rainbow Petroleum Co. v. Union Drilling & Petroleum Co., 115 Cal.App. 275, 1 P.2d 489; Kaye v. M'Divani, 6 Cal.App.2d 132, 44 P.2d 371.

480

The next proposition to be determined is the quantity or number of tons for which defendant is liable under that contract. In determining the obligations provided for under this contract, the intent of the parties as gathered from the entire contract must be arrived at, and in arriving at that intent we are bound by the ordinary meaning of those words and are not permitted to go beyond the words used, unless the provisions are ambiguous, and then only to explain such ambiguity.

Reading paragraphs 6 and 7 together, it is evident that defendant agreed to pay for any steel returned which failed to meet the term "good condition." The phrase "good condition" cannot alone be interpreted as meaning anything helpful towards arriving at the intent or purpose of the parties. Resort must be had to the facts and circumstances surrounding the particular undertaking existing between the parties at the time of their executing the contract in question. Those facts are: Defendant, prior to the contract, knew the nature of the work it was undertaking. It knew that the steel originally purchased for bracing could not resist the pressure to which it was required to withstand. With that information it sought the use of the steel owned by plaintiff. The representative of defendant measured the size and weight of the steel which composed the truss and bridge structures. With knowledge of the existing conditions defendant prepared the contract, using their own words in paraphrasing the terms of their agreement, "The contract provides that this steel is to be used as 'cofferdam bracing' ", with a proviso that at completion of rental period the defendant is to turn over to plaintiff at plaintiff's yard all steel in good condition, less ordinary wear and tear inherent to such type of work.

Defendant admits that at time contract was executed, it was expected that the steel rented from plaintiff would be buckled and badly damaged beyond repair; that the stipulation "good condition" was used with the understanding that some of the steel rented from plaintiff would not be usable again, and would be classified as junk. This representative further stated that he was ashamed to return some of this steel in view of the fact that he had used it sixty times and that they were so badly battered up that he was ashamed to send it back; that some of it was in such bad shape as to be beyond normal wear and tear. Plates were missing and one small part of one large beam had been cut off to a length of less than one foot, for all of which defendant voluntarily charged to itself.

The Court is of the opinion that plaintiff's steel was used beyond the terms of the contract, and, according to the record, was used beyond the expectation of the plaintiff and contrary to the expressed provisions of the contract. If it was within the contemplation of defendant to cut and recut the steel beams of plaintiff and to place them under such strain as to cause them to buckle and bend, and destroy their future use, then defendant should have protected itself by inserting in such contract stipulations to absolve itself against such contemplated use.

Defendant's representatives had full knowledge of the surrounding conditions, the use to which the steel would be subjected, and the final condition in which the steel would be left. The Court is of the opinion that the agreement wherein defendant stipulated to turn over to plaintiff all steel in "good condition, less ordinary wear and tear inherent to such type of work" is not sufficient to relieve defendant from its obligation to account for any steel not returned, or for any steel that was welded together after being cut, or that which was buckled or delivered in unusable lengths, shorter than when received by defendants.

Ordinary "wear and tear" does not mean total destruction of the material, or in this case the steel beams rented for use by defendant, but includes reasonable wear and tear by depreciation in value of the thing or material as may arise from ordinary and reasonable use. The steel in question was used by defendant in a most unreasonable manner; it was cut and recut, spliced, and respliced. After such

unreasonable use, that which remained caused defendant's representative through shame not to return it.

The remaining issue is to arrive at the amount of defendant's liability.

The amount of plaintiff's claim must be arrived at from the number of tons of steel not returned, or returned and not in good condition. The steel in question was assembled in four trusses and one bridge. These were to be disassembled, and the steel beams salvaged therefrom was the steel which defendant contracted to use and return. The disassembling was to be performed by defendant. Defendant at no time weighed any of the steel obtained through the disassembling, and, after using, no part of the steel was weighed before returning it to plaintiff's yard. Though defendant's representatives knew that their contract obligated them to pay on a tonnage basis for any steel not returned, or returned in bad condition, and also knew that some of the steel through the fact that it was "junk" would not be returned, they made no effort to weigh any part returned, or any part not returned. Under such state of conditions, the only basis for arriving at number of tons not returned, or returned in bad condition, is to accept the estimates of the engineers; which estimates were made by taking the blueprint drawings of the trusses and bridge, and from those drawings obtained the size and length of the beams constituting the structures, and from such size and length to approximate their weight.

The services of two civil engineers, a Mr. Manuel V. Patino, and a Mr. Luis E. Estenoz, were obtained by plaintiff for the purpose of determining the weight of steel returned in good condition, and the weight of steel returned in bad condition, and the weight of steel not returned at all. The two engineers considered each piece of disassembled steel which had been returned, measuring the length, breadth and thickness, and from Standard Engineering Handbooks estimated the weight of the disassembled parts. From their examination and measurements, the following classifications were made: (1) Total weight of the structures before being disassembled, (2) Total quantity or weight of the steel returned, and (3) the quantity and weight of the steel not returned. The item captioned "Steel returned" was entered under two classifications, one of which was captioned "Steel returned in good condition" and the other, "Steel returned in bad condition."

The system, or procedure, followed by the two engineers, and their findings, are evidenced by Exhibit "A". The findings and report of these engineers, as evidenced by Exhibit "A", were concurred in by Mr. Frank Molter, a structural engineer, who was offered as a witness for defendant, with the exception that there was a different result arrived at by Mr. Molter with reference to the weight of rivets and bolts.

Likewise, the findings and report of the two engineers was checked by Mr. Kersting, defendant's Superintendant, and the engineers' findings were conformable to the findings of Mr. Kersting. (Page 86, Transcript of Testimony).

In view of the engineers' report having been concurred in by both parties, with the exception as to the item "wedge blocks", such report, or Exhibit "A", will be considered for evidential facts in ascertaining the amount of defendant's liability.

The Court is of the opinion that the weights of the twenty wedge blocks itemized as missing should not be considered. Therefore, the weight of 66,000 pounds for the twenty missing wedge blocks is denied, such denial being based on the fact that the engineers were in error when they estimated thirty-two wedge blocks, when in fact only twelve existed. (See page 43, Transcript of Testimony). Upon this finding, the 66,000 pounds will be deducted from the total of 108,903 pounds of missing steel.

Likewise, the claim for weight of "rivets and bolts" listed under the classification of "missing steel" is denied. The reason for the denial of this item is that both parties understood that the trusses were to be dis-

482

mantled in obtaining the steel beams comprising those structures. The contract stipulated that the steel beams obtained therefrom would be used as "cofferdam bracing." Each party was conversant with, and knew what necessary parts were to be obtained, and the use to which such parts were to be placed. No provision was made relative to bolts or rivets, or their use or return, and it is apparent that the provision requiring a return of steel did not include the rivets or bolts. Therefore the item of rivets and bolts, the weight of which is estimated at 16,029 pounds, under the classification of "missing steel" is denied.

Taking both items, the weight of the twenty wedge blocks of 66,000 pounds, and the weight of the rivets and bolts of 16,029 pounds, making a total weight of 82,029 pounds, this total will be deducted from the estimate of 108,903 pounds captioned as "missing steel". Therefore the Court adjudges that the weight of missing steel is 26,874 pounds. The weight of the steel of which its use had been destroyed, or in bad condition, and listed under the caption "Unacceptable Steel", the Court adjudges to be 300,736 pounds. The total of both findings is 327,610 pounds, which, when reduced to tonnage, amounts to 163.85 tons. At the stipulated price of $59.00 per ton, judgment will be entered in favor of plaintiff, and against MacDonald Construction Company, in the sum of $9,667.15, with interest, from date of filing complaint, and costs.

The steel classified as "unacceptable steel" with a weight of 300,736 pounds, having some potential value, it is ordered that the 300,736 pounds be sold for the best price obtainable and the proceeds therefrom shall be credited on the judgment herein. If the parties hereto can arrive at the value of such steel, or an agreed stipulation as to the value thereof, the amount of the agreed value will be credited as directed herein. The sale of such steel, or an agreed stipulation as to the value thereof, shall be completed and carried out within 30 days from the date of this judgment, and the enforcement of this judgment is hereby stayed for a period of 30 days from the entry thereof.

Counsel for defendant by way of defense to plaintiff's alleged cause of action has pleaded Sections 2153 of Title 4, and Sections 761 and 762 of Title 3, of the Code of Civil Procedure and Civil Code, together with other defenses. The Court is of the opinion that the defenses alleged in the answer of defendant offer no legal defense to claim of plaintiff, or to the findings of fact and law indicated herein.

Counsel for plaintiff will prepare judgment in accordance with the findings contained in this opinion.